JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**

PurpleLab, Inc.

**DEFENDANTS**

Stephen Russ Cobb, Jr., Komodo Health Inc. t/a Komodo

**(b)** County of Residence of First Listed Plaintiff   Chester
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Kyle Garabedian
Kang Haggerty LLC
123 S. Broad Street, Suite 1950

Attorneys *(If Known)*

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☒ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*    Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | ☐ 820 Copyrights | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 840 Trademark | ☐ 460 Deportation |
| | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | ☒ 880 Defend Trade Secrets Act of 2016 | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | | | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
18 U.S.C. § 1836 et. seq.
Brief description of cause:
Misappropriation of trade secrets, breach of contract.

**VII. REQUESTED IN COMPLAINT:** ☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.    DEMAND $    CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

**VIII. RELATED CASE(S) IF ANY** *(See instructions):*    JUDGE     DOCKET NUMBER

DATE
Feb 4, 2026

SIGNATURE OF ATTORNEY OF RECORD
/s/Kyle Garabedian

**FOR OFFICE USE ONLY**

RECEIPT #     AMOUNT     APPLYING IFP     JUDGE     MAG. JUDGE

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

 **(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

 **(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**

Place of Accident, Incident, or Transaction: ___Wayne, Pennsylvania_____

---

***RELATED CASE IF ANY:*** Case Number:_____ Judge:_____

1. Does this case involve property included in an earlier numbered suit?     Yes ☐

2. Does this case involve a transaction or occurrence which was the subject of an earlier numbered suit?     Yes ☐

3. Does this case involve the validity or infringement of a patent which was the subject of an earlier numbered suit?     Yes ☐

4. Is this case a second or successive habeas corpus petition, social security appeal, or pro se case filed by the same individual?     Yes ☐

5. Is this case related to an earlier numbered suit even though none of the above categories apply?     Yes ☐
   If yes, attach an explanation.

I certify that, to the best of my knowledge and belief, the within case ☐ **is** / ☐ **is not** related to any pending or previously terminated action in this court.

---

**Civil Litigation Categories**

*A.* *Federal Question Cases:*

- ☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
- ☐ 2. FELA
- ☐ 3. Jones Act-Personal Injury
- ☐ 4. Antitrust
- ☐ 5. Wage and Hour Class Action/Collective Action
- ☐ 6. Patent
- ☐ 7. Copyright/Trademark
- ☐ 8. Employment
- ☐ 9. Labor-Management Relations
- ☐ 10. Civil Rights
- ☐ 11. Habeas Corpus
- ☐ 12. Securities Cases
- ☐ 13. Social Security Review Cases
- ☐ 14. Qui Tam Cases
- ☐ 15. Cases Seeking Systemic Relief  **\*see certification below\***
- ☒ 16. All Other Federal Question Cases. *(Please specify):* __Trade Secret Misappropriation__

*B.* *Diversity Jurisdiction Cases:*

- ☐ 1. Insurance Contract and Other Contracts
- ☐ 2. Airplane Personal Injury
- ☐ 3. Assault, Defamation
- ☐ 4. Marine Personal Injury
- ☐ 5. Motor Vehicle Personal Injury
- ☐ 6. Other Personal Injury *(Please specify)*:_____
- ☐ 7. Products Liability
- ☐ 8. All Other Diversity Cases:  *(Please specify)*_____
      _____

I certify that, to the best of my knowledge and belief, that the remedy sought in this case ☐ **does** / ☒ **does not** have implications beyond the parties before the court and ☐ **does** / ☒ **does not** seek to bar or mandate statewide or nationwide enforcement of a state or federal law including a rule, regulation, policy, or order of the executive branch or a state or federal agency, whether by declaratory judgment and/or any form of injunctive relief.

---

**ARBITRATION CERTIFICATION (CHECK ONLY ONE BOX BELOW)**

I certify that, to the best of my knowledge and belief:

☒ Pursuant to Local Civil Rule 53.2(3), this case is not eligible for arbitration either because (1) it seeks relief other than money damages; (2) the money damages sought are in excess of $150,000 exclusive of interest and costs; (3) it is a social security case, includes a prisoner as a party, or alleges a violation of a right secured by the U.S. Constitution, or (4) jurisdiction is based in whole or in part on 28 U.S.C. § 1343.

☐ None of the restrictions in Local Civil Rule 53.2 apply and this case is eligible for arbitration.

NOTE: A trial de novo will be by jury only if there has been compliance with F.R.C.P. 38.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| PURPLELAB, INC. | : | |
| Plaintiff, | : | |
| v. | : | Civil Action No. _____ |
| STEPHEN RUSSELL COBB JR. AND KOMODO HEALTH, INC. T/A "KOMODO" | : | |
| Defendants. | : | |

## **VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

Plaintiff PurpleLab, Inc. ("PurpleLab" or "Plaintiff" or "Company"), through its undersigned attorneys, hereby alleges the following against Defendants Stephen Russell Cobb Jr. ("Mr. Cobb") and Komodo Health, Inc. t/a "Komodo" ("Komodo") in this Verified Complaint for Injunctive Relief and Damages:

## **INTRODUCTION**

1.      This case arises from the theft of trade secrets by a former employee, Mr. Cobb, including highly sensitive client lists, sales data, pricing strategies, and other information that can be used to undercut PurpleLab's business and the misuse of that data by one of PurpleLab's largest competitors in the healthcare-data space, Komodo.

2.      This data theft also violated multiple agreements between Mr. Cobb and PurpleLab, including a Confidential Information and Invention Assignment Agreement (the "CIIA") and a Separation Agreement. The CIIA and Separation Agreement include clauses requiring non-disclosure and non-use of PurpleLab's confidential information.

3.      Mr. Cobb was terminated from PurpleLab on December 1, 2025.

4.     Only ten days before, on November 21, 2025, Mr. Cobb made three bulk exports from HubSpot, the Customer Relationship Management software used by PurpleLab to store sensitive client-related data.

5.     The data downloaded by Mr. Cobb included all PurpleLab's current and former client contact information, pricing proposals, and communications related to the negotiations of over 2,000 total deals.

6.     The massive data exports encapsulated nearly all information on PurpleLab's entire commercial deal history.

7.     The data downloaded by Mr. Cobb could be devastating in the hands of a competitor, as it can be used to identify all PurpleLab's current, former, and prospective customers and completely undercut them in the market.

8.     At the time of the bulk downloads from HubSpot, a forensic analysis of Mr. Cobb's company-issued laptop reveals that he connected his personal USB data storage devices to the laptop, enabling him to take the exported data with him.

9.     Without skipping a beat, Mr. Cobb began working as Komodo's "Head of Revenue Marketing" shortly after his December 1, 2025, termination with PurpleLab.

10.     At the time of the data export, Mr. Cobb informed a vendor that he was already interviewing for a position with Komodo.

11.     Upon information and belief, Mr. Cobb has improperly used and disclosed PurpleLab's confidential information to solicit PurpleLab's current, former, and potential customers.

12.     As set forth in greater detail below, since Mr. Cobb left the Company, PurpleLab suddenly lost two virtually finalized deals with potential clients worth millions of dollars.

13.    One of those potential clients confirmed that they took their business to Komodo.

14.    PurpleLab now finds itself incurring costs and legal fees to enforce its rights and protect its proprietary information that it spent substantial time and money to build.

15.    As such, PurpleLab is requesting that this Court issue a temporary restraining order and a preliminary injunction to, among other things, enjoin Mr. Cobb and Komodo's further misappropriation of PurpleLab's confidential information, and award PurpleLab money damages for Mr. Cobb and Komodo's unlawful actions.

## THE PARTIES

16.    PurpleLab is a corporation formed under the laws of the state of Delaware, with its principal place of business in Wayne, Pennsylvania.

17.    Upon information and belief, Mr. Cobb is a North Carolina citizen residing at 3108 Canoe Brook Parkway, Raleigh, NC 27614.

18.    Upon information and belief, Komodo is a corporation formed under the laws of the state of Delaware, with a principal place of business at 75 Hawthorne Street, Suite 500, San Francisco, CA 94105.

## JURISDICTION AND VENUE

19.    This is a civil action arising out of, among other things, the Defend Trade Secrets Act of 2016 (DTSA), 18 U.S.C. § 1836, *et seq*, which raises a federal question, pursuant to 28 U.S.C. § 1331. This Court has subject matter jurisdiction over this matter pursuant to 18 U.S.C. § 1836(c) and 18 U.S.C. § 1331 in that certain of the claims arise under the laws of the United States. PurpleLab's additional claims fall within the Court's supplemental jurisdiction because the claims are so related to the federal question that they form part of the same case or controversy. *See* 28 U.S.C. § 1367.

20.     This Court has personal jurisdiction over Mr. Cobb, as he had worked for and sought employment with PurpleLab, a Pennsylvania-based company, and solicited business from clients in Pennsylvania.

21.     Additionally, Mr. Cobb agreed in the Separation Agreement "that any action, demand, claim or counterclaim relating" to his employment "shall be commenced in the Commonwealth of Pennsylvania." Separation Agreement *infra* at § 7(v).

22.     Additionally, the breach of the CIIA and Separation Agreement and other tortious acts involve the misappropriation of data stored in Pennsylvania, causing injury to PurpleLab in Pennsylvania.

23.     Komodo similarly is making use of misappropriated data that was taken from Pennsylvania.

24.     Upon information and belief, Komodo regularly offers its services in Pennsylvania.

25.     Upon information and belief, Komodo used the data obtained from PurpleLab to contact customers in Pennsylvania.

26.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) as a substantial part of the events giving rise to the claims in this Complaint occurred in this District.

## STATEMENT OF FACTS

### Mr. Cobb's Employment with PurpleLab

27.     PurpleLab is a healthcare data analytics company that transforms massive sets of real-world healthcare-related data into manageable and useful insights for its clients.

28.     Competition in the healthcare data analytics industry is particularly fierce, with multiple competitors vying for the business of the same few customers. As such, it is vital for a company in the industry to safeguard its confidential information and trade secrets, such as

customer lists, pricing, and scope of services, to safeguard against being undercut by a rival company.

29.    PurpleLab spends considerable time, money, and effort to develop and maintain its sales and marketing strategies, pricing strategies, and business development plans, among other confidential and proprietary information. As a result of these efforts, PurpleLab has successfully competed against much larger, better-funded companies in the industry.

30.    PurpleLab hired Mr. Cobb on April 3, 2023, to be their new Chief Marketing Officer ("CMO").

31.    As a leader and C-suite executive, Mr. Cobb was offered a $315,000/year salary, performance-based bonuses, and stock options. A true and accurate copy of the March 24, 2023, offer letter to Mr. Cobb is attached hereto as **Exhibit A**.

32.    As CMO, Mr. Cobb's responsibilities included, but were not limited to, "[o]verseeing corporate marketing (branding), product marketing, inside sales and demand generation functions" and being responsible for "competitive intelligence." *See Ex*. A.

33.    As CMO, Mr. Cobb reported directly to PurpleLab's founder and CEO, Mark Brosso ("Mr. Brosso").

34.    Mr. Cobb's C-suite position exposed him to PurpleLab's most sensitive data, including customer and client lists, rates, pay scales, and other proprietary trade secrets.

35.    Mr. Cobb signed the CIIA on March 24, 2023, in part, to protect its confidential information and trade secrets. *See generally*, the CIAA attached hereto as **Exhibit B**.

36.    While working for the PurpleLab, Mr. Cobb had unfettered access to PurpleLab's Confidential Information. The CIIA defines "Confidential Information" as:

> …   any Company proprietary information, technical data, trade secrets or know-how, including, without limitation, unique selling,

manufacturing and servicing methods and business techniques, research, product plans, products, services, suppliers, customer lists and past, current and future customers (including, without limitation, customers of the Company [that Mr. Cobb would become acquainted with during his employment]), vendor information, prices and costs, markets, software (both object code and source code), developments, inventions, notebooks, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing materials and plans, licenses, finances, budgets, training, service and business manuals, promotional materials, training courses and other training and instructional materials or other business information disclosed to [Mr. Cobb] by the Company either directly or indirectly in writing, orally or by drawings or observation of documents, parts or equipment or created by [Mr. Cobb] during the period of the Relationship, whether or not during working hours… "Confidential Information" includes, without limitation, information pertaining to any aspect of the Company's business, which is either information not known by actual or potential competitors of the Company or other third parties not under confidentiality obligations to the Company, or is otherwise proprietary information of the Company or its partners, investors, customers or suppliers, whether of a technical nature or otherwise.[1]

Ex. B at § 4(a).

37.    At all relevant times, PurpleLab owned and lawfully possessed the Confidential Information and has not authorized Mr. Cobb (or Komodo) to disclose or use them outside of Mr. Cobb's employment obligations to PurpleLab.

38.    PurpleLab's Confidential Information provides it with an economic advantage, is not generally known in the industry or otherwise, and is the result of significant expenditures of resources and effort.

39.    The economic advantage derived from the Confidential Information is valuable precisely *because* it is confidential and not generally known—if obtained by a competitor, it could

---

[1] Hereinafter, this Complaint will refer to this definition as the "Confidential Information."

be used to undercut PurpleLab's pricing, negotiations, and existing or prospective business relationships.

40.    Said differently, a competitor with access to the Confidential Information would have a significant advantage in negotiations with potential customers, and could offer a tailored services package designed to undermine any negotiations with PurpleLab.

41.    Given its value, PurpleLab undertakes significant efforts to safeguard its Confidential Information by, including but not limited to, requiring important employees to sign the CIIA.

42.    As part of PurpleLab's efforts to safeguard its Confidential Information, the CIIA also includes the following provisions:

> I agree at all times during the term of my Relationship with the Company and thereafter, to hold in strictest confidence, and not to use, except for the benefit of the Company to the extent necessary to perform my obligations to the Company under the Relationship, or to disclose to any person, firm, corporation or other entity without written authorization of the Company, any Confidential Information of the Company which I obtain or create.
> …
> I agree that, at the time of termination of my Relationship with the Company, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, laboratory notebooks, materials, flow charts, equipment, other documents or property, or reproductions of any of the aforementioned items developed by me pursuant to the Relationship or otherwise belonging to the Company, its successors or assigns.
> …
> [D]uring the term of my Relationship with the Company, and for a period of twenty-four months immediately following termination… I shall not use any Confidential Information of the Company to attempt to negatively influence any of the Company's clients or customers from purchasing Company products or services or to solicit or influence or attempt to influence any client, customer or other person either directly or indirectly, to direct his, her or its purchase of products and/or services to any person, firm,

corporation, or other entity in competition with the business of the Company.

Ex. B at §§ 4(a), 6, 8.

43.     The above provisions in the CIIA are necessary to protect the Confidential Information from being disclosed to a competitor or any other individual.

44.     Importantly, Mr. Cobb also:

> acknowledge[s] and agree[s] that violation of this Agreement by me may <u>cause the Company irreparable harm</u> and therefore agree that <u>the Company will be entitled to seek extraordinary relief in court, including without limitation, temporary restraining orders, preliminary injunctions and permanent injunctions without the necessity of posting a bond or other security</u> and in addition to and without prejudice to any other rights or remedies that the Company may have for a breach of this Agreement.

*Id*. at § 10(f) (emphasis added).

45.     Mr. Cobb and PurpleLab executed the agreement on March 24, 2023.

46.     Mr. Cobb began serving as the CMO of PurpleLab on April 3, 2023, and remained CMO until December 1, 2025.

## PurpleLab and Mr. Cobb Amicably Separate

47.     On November 10, 2025, PurpleLab informed Mr. Cobb that it would be terminating their business relationship as of December 1, 2025, as part of an overall reduction in workforce.

48.     At the time, it was generally known to Mr. Cobb that changes to the marketing department, including potential termination of employees, may be coming.

49.     Acknowledging the disruption that this change would bring, PurpleLab went out of its way to treat Mr. Cobb fairly and ease any hardship from this transition.

50.     The terms of the separation were memorialized in the Separation Agreement. A true and accurate copy of the Separation Agreement is attached hereto as **Exhibit C**.

51.     The December 1, 2025, end date was specifically chosen so that Mr. Cobb would receive an additional month of health insurance benefits for the month of December.

52.     The Separation Agreement additionally afforded Mr. Cobb the opportunity to immediately work for a competitor, which was previously prohibited under the CIIA. *See Ex*. B at 9(f), Ex. C at § 4(ii)

53.     Additionally, as a professional courtesy, PurpleLab provided an extension of Mr. Cobb's stock options through the Advisory Agreement (attached to the Separation Agreement as Ex. A), which otherwise would have expired shortly after termination. PurpleLab also provided a generous severance payment, including three months of pay.

54.     In exchange, Mr. Cobb made several representations. For example, Mr. Cobb agreed that he would continue to abide by the terms of the CIIA, except for the non-compete provision. *See* Ex. C at §§ 4(ii) & 4(iii) (stating that Mr. Cobb agrees to "abide by the [CIIA] and any applicable common law and/or statutory obligations relating to the protecting and non-disclosure of PurpleLab's trade secrets and/or confidential and proprietary documents and information, and you specifically agree that you will not disclose any confidential or proprietary information that you acquired as an employee of PurpleLab to any other person or entity, or use such information in any manner.").

**Mr. Cobb Exports All of PurpleLab's Deal Data Immediately Following Interviews with
<u>Komodo</u>**

55.     Knowing that his termination with PurpleLab was approaching, Mr. Cobb began interviewing with Komodo before November 21, 2025.

56.     A text message sent from Mr. Cobb to one of PurpleLab's vendors dated November 21, 2025, discussed that Mr. Cobb was in the "final interview stage" and that "Web gave [Mr.

Cobb] the green light apparently." A true and accurate screenshot of the text messages from Mr. Cobb is attached hereto as **Exhibit D**.

57.    Upon information and belief, "Web" refers to Mr. Web Sun, the co-founder and President at Komodo.

58.    However, on November 21, 2025, the very same day, Mr. Cobb covertly initiated three massive downloads of PurpleLab's most sensitive files from its customer relationship management software, HubSpot.

59.    As the CMO, Mr. Cobb was one of the few people with the permissions needed to initiate such a download.

60.    At 6:01 PM, 6:07 PM, and 6:19 PM, Mr. Cobb used his HubSpot login to initiate three data exports from HubSpot. A copy of the HubSpot audit logs is attached hereto as **Exhibit E**.

61.    To PurpleLab's knowledge, the November 21 exports were the only times Mr. Cobb ever initiated an export from HubSpot.

62.    The export included files containing "All Deals" for PurpleLab. *See* Ex. E.

63.    As a result, the data export included all PurpleLab's current and former records and information on over 2,000 total deals. *Id*.

64.    Each deal comprised approximately 672 individual properties, including product, features, pricing, and associated contacts.

65.    Stated otherwise, Mr. Cobb exported nearly all information on PurpleLab's entire commercial deal history.

66.    The files also included the actual communications between PurpleLab's sales team and its customers, discussing and negotiating the terms of each deal.

67.     This information not only reveals PurpleLab's customer contacts but also intimate details of its negotiations with customers, including product offerings and pricing strategies.

68.     There was no legitimate reason for Mr. Cobb to suddenly export all PurpleLab's files in the final days of his employment.

69.     In the CIIA, Mr. Cobb agreed "not to make copies of such Confidential Information except as authorized by the Company." *See Ex*. B at 4(a).

70.     Mr. Cobb did not notify anyone at PurpleLab about his mass exports, nor did he seek permission to initiate the exports.

71.     Shortly thereafter, Mr. Cobb began working as Komodo's "Head of Revenue Marketing."

72.     In a similar marketing position, Mr. Cobb has job responsibilities substantially the same as his role as PurpleLab's CMO.

73.     In this new position with Komodo, Mr. Cobb is well-positioned to use the stolen data against PurpleLab to promote Komodo's competing data service.

## PurpleLab Discovers the Data Theft

74.     In late 2025, PurpleLab was negotiating a potential contract with a North Carolina corporation ("Client 1"). Communications related to the negotiations, including the price, scope of work, and other critical details, were saved in the files that Mr. Cobb downloaded.

75.     By December 2025, Client 1's senior management and ownership had communicated to PurpleLab that they were switching from Komodo, the incumbent vendor to PurpleLab based on comparable data and more favorable pricing.

76.     The negotiations had seemingly concluded, with PurpleLab agreeing to meet the client's requested services and price point.

77.    The deal with Client 1 would generate estimated revenue for PurpleLab of approximately $500,000 per year.

78.    Client 1's owners then communicated to Mr. Brosso, on December 12, 2025, that they were considering a short-term extension with Komodo based on the expected timelines needed to complete a change in management.

79.    On January 5, 2026, Client 1 wrote to Mr. Brosso stating that it decided to "sign[] an extension of their [earlier] agreement with Komodo and intend that to be [their] primary data source in 2026… Cost is also a key factor and our agreement locks in a guaranteed cost for closed claims… all at a very advantageous price point."

80.    The length of the deal and the advantageous price point was a surprise since PurpleLab had structured its deal with Client 1, believing that its price and scope of work was more cost-effective for Client 1 than the existing deal between Client 1 and Komodo.

81.    At the same time, PurpleLab was finalizing negotiations with a Pennsylvania pharmaceutical company ("Client 2"). Negotiations with Client 2 were also complete, and on January 5, 2026, Client 2 stated that it was prepared to move forward with the deal.

82.    The deal with Client 2 would produce revenue for Purple Lab of $1.1 million per year.

83.    Thereafter, Client 2 abruptly stopped replying to PurpleLab altogether.

84.    These last-minute about-faces of Clients 1 & 2 are highly unusual in the healthcare data analytics industry.

85.    Around the same time, two vendors that work with both PurpleLab and Komodo reported that they had heard Komodo was offering its sales team extra incentives if they could take customers from PurpleLab.

86.    The PurpleLab team tried to make sense of the sudden loss of potential clients, eventually considering that there may have been a leak of the deals' specifications and price to Komodo.

87.    If Komodo had access to this Confidential Information, they could swoop in at the last moment and undercut PurpleLab's prices through a tailored offer based on the Confidential Information.

88.    As part of PurpleLab's investigation into a potential leak, on January 23, 2026, PurpleLab generated an audit log from HubSpot to check for anomalies. *See* Ex. E.

89.    Through the HubSpot audit logs, PurpleLab learned for the first time about Mr. Cobb's misappropriation of the Confidential Information.

90.    Unfortunately, due to the time passed between Mr. Cobb's departure and the discovery of the misappropriated data, the full extent of the other information likely taken could not be determined.

91.    This is primarily because Mr. Cobb's user account on his company-issued laptop had already been deleted in anticipation of the laptop being repurposed for other employees.

92.    Mr. Cobb's company emails were similarly not preserved after his departure.

93.    Given the seemingly amicable separation, PurpleLab did not take any unusual steps to preserve his data.

94.    However, after reviewing the HubSpot audit logs, PurpleLab provided Mr. Cobb's laptop to the Capsicum Group for a forensic review.

95.    While little data remained available on the laptop, Brian Halpin, a digital forensics expert with Capsicum, was able to determine when external data devices, such as USB thumb drives, were connected to Mr. Cobb's laptop.

96.     Capsicum determined that Mr. Cobb connected two separate USB devices to his company laptop: a SanDisk Ultra USB 3.0, Serial Number: 4C530001210105109155, and a JetFlash Transcend 64GB, Serial Number: 9YH62RE0. *See* Affidavit of Mr. Halpin and accompanying report attached as **Exhibit F**.

97.     These USB drives were not issued by PurpleLab, as such devices are not part of standard data management for PurpleLab employees.

98.     Between the availability of online file storage through Google Drive or DropBox, and the company-issued laptop, there was no reason for Mr. Cobb to use a USB drive as part of his work.

99.     In fact, Mr. Cobb used such a device on his company laptop for the first time only a few days before his termination was formally announced.

100.    Between October 20, 2025, and December 1, Mr. Cobb connected those USB devices to his laptop approximately fifty-five times. *See* Ex. F.

101.    This included connecting a USB Device at 5:22 PM on November 21, 2025, right before Mr. Cobb initiated mass exports from HubSpot. *Id*.

102.    There is no reason for someone to use such a USB device unless they are copying data from the computer.

103.    Purple Lab believes, and therefore avers, that Mr. Cobb downloaded data from his laptop during each of the approximately fifty-five connections to his laptop.

104.    As noted above, Komodo is a direct competitor to PurpleLab. However, Komodo is a significantly larger company, with a valuation exceeding $3 billion and with over 700 employees.

14

105.    A leak of Confidential Information to Komodo poses an existential and irreparable threat to PurpleLab.

106.    By poaching PurpleLab's customers, such as Client 1 & 2, Komodo not only gains the profits from any contracts signed, but it also gains the benefit of hindering its competition in this already competitive industry.

107.    Upon information and belief, Komodo, given its experience and size, knew or should have known that Mr. Cobb possessed PurpleLab's Confidential Information and that Mr. Cobb was contractually obligated to refrain from disclosing or misappropriating said Confidential Information.

108.    Upon information and belief, Mr. Cobb has disclosed the Confidential Information he stole to his benefit and Komodo's. In turn, Komodo also caused the Confidential Information to be used or misappropriated.

109.    The disclosure and misappropriation of the Confidential Information have already caused, and will continue to cause, significant and irreparable damages to PurpleLab.

110.    If not curtailed, all PurpleLab's customer relationships could be undermined.

111.    For the foregoing reasons, PurpleLab now seeks injunctive relief against Mr. Cobb and Komodo as is necessary to prevent further violations of the CIIA and Separation Agreement and to protect the Confidential Information, and monetary compensation for the damage caused by Mr. Cobb's multiple breaches.

<u>COUNT I</u>
## VIOLATION OF THE FEDERAL DEFEND TRADE SECRET ACT
### (18 U.S.C. § 1836 *et. sec*) (against Mr. Cobb and Komodo)

112.    PurpleLab incorporates by reference each preceding paragraph of this Verified Complaint as if fully restated herein.

113.    During his employment at PurpleLab, Mr. Cobb possessed and had access to PurpleLab's Confidential Information and trade secrets, which he had an obligation to keep confidential and secret.

114.    Upon termination of his employment with PurpleLab, Mr. Cobb possessed extensive Confidential Information, much of which he copied for himself before termination, that, upon information and belief, has been disclosed to Komodo, and much of which will inevitably be disclosed to Komodo through his present employment.

115.    At Komodo, Mr. Cobb has and will use PurpleLab's Confidential Information in his solicitations and dealings with customers, including current and prospective customers of PurpleLab.

116.    PurpleLab's Confidential Information qualifies as trade secrets under the Defend Trade Secrets Act ("DTSA").

117.    PurpleLab's Confidential Information is not made available to the public and is carefully guarded by PurpleLab for the purposes of maintaining a competitive advantage over PurpleLab's competitors, such as Komodo.

118.    Komodo is aware that Mr. Cobb has access to Confidential Information and that Mr. Cobb is obligated to refrain from disclosing or misappropriating the Confidential Information.

119.    Komodo has acquired and used Confidential Information through inappropriate and improper means.

120.    Mr. Cobb and Komodo's misappropriation of the Confidential Information has a direct impact on interstate and/or foreign commerce, as the Confidential Information is related to services and products provided by PurpleLab that are used in and intended for use in interstate commerce.

121.    The Confidential Information holds significant value to PurpleLab and its competitors and was the result of substantial time, money, and effort. The Confidential Information is not easily acquired or duplicated by others but continues to be used and misappropriated by Mr. Cobb and Komodo.

122.    PurpleLab's Confidential Information and trade secrets include, but are not limited to, its client list, customer contact information, communications regarding negotiations, pricing information, and the scope of services sought by clients.

123.    PurpleLab undertook reasonable measures to maintain the secrecy of its Confidential Information through confidentiality clauses in the CIIA and Separation Agreement, and through the use of passwords and cybersecurity software.

124.    Unless enjoined, Mr. Cobb and Komodo will continue to use, divulge, acquire, and/or otherwise misappropriate PurpleLab's Confidential Information.

125.    Pursuant to 18 U.S.C. § 1836, PurpleLab is entitled to injunctive relief to prevent Mr. Cobb and Komodo from the continuing use and misappropriation of PurpleLab's Confidential Information.

126.    PurpleLab is also entitled to damages for the losses caused by the prior and continuing misappropriation of the Confidential Information pursuant to 18 U.S.C. § 1836.

127.    This includes, but is not limited to, the lost revenues that would have been obtained from Client 1 and Client 2.

128.     Mr. Cobb and Komodo's actions are intentional, willful, outrageous, and malicious, justifying PurpleLab's request for injunctive relief and actual and exemplary damages, including attorneys' fees and costs, and punitive damages.

<u>**COUNT II**</u>
**VIOLATION OF THE PENNSYLVANIA UNIFORM TRADE SECRETS ACT**
**(against Mr. Cobb and Komodo)**

129.     PurpleLab incorporates by reference each preceding paragraph of this Verified Complaint as if fully restated herein.

130.     Mr. Cobb had access to the Confidential Information and other trade secrets throughout his employment with PurpleLab.

131.     Mr. Cobb had a duty to maintain the confidentiality of the Confidential Information.

132.     When Komodo hired Mr. Cobb, it had knowledge that Mr. Cobb was in possession of Confidential Information.

133.     Komodo is aware that Mr. Cobb has access to Confidential Information and that Mr. Cobb is obligated to refrain from disclosing or misappropriating Confidential Information.

134.     Komodo and Mr. Cobb have acquired Confidential Information through inappropriate and improper means.

135.     Komodo received and continues to receive Confidential Information from Mr. Cobb and has used it to the detriment of PurpleLab.

136.     PurpleLab took reasonable measures to protect its Confidential Information from the public and competitors through the use of non-competition agreements and protective digital software. PurpleLab reasonably assumed that Mr. Cobb would honor his lawful and contractual obligations not to disclose the Confidential Information or otherwise breach the CIIA and Separation Agreement.

137.    The Confidential Information derives its economic value from specifically its secrecy, and allows PurpleLab to maintain a competitive edge over its competitors, such as Komodo.

138.    The Confidential Information is a trade secret under the Pennsylvania Uniform Trades Secret Act ("PUTSA"), 12 Pa.C.S. §§ 5301-5308, because it includes *inter alia*, customer list, business methods and techniques, that derive its economic value from not being readily known to the public, and is not readily ascertainable by proper means by the public or by PurpleLab's competitors, and PurpleLab takes reasonable precautions and efforts to keep the Confidential Information secretive.

139.    Misappropriation of Confidential Information causes PurpleLab irreparable harm.

140.    PurpleLab reasonably assumed that Mr. Cobb would honor his lawful and contractual obligations not to disclose the Confidential Information or otherwise breach the CIIA and Separation Agreement.

141.    As CMO, Mr. Cobb obtained the Confidential Information while he was in a unique position of trust and confidence.

142.    Unless enjoined, Mr. Cobb and Komodo will continue to use, divulge, acquire, and/or otherwise misappropriate PurpleLab's Confidential Information.

143.    PurpleLab is entitled to injunctive relief and monetary damages in an amount to be determined at trial. PurpleLab seeks injunctive relief and monetary and economic damages provided by 12 Pa.C.S. §§ 5304, 5308.

144.    Mr. Cobb and Komodo's actions were and continue to be intentional, willful, outrageous, and malicious, justifying the imposition of injunctive relief and actual and exemplary damages, including attorneys' fees and costs, and punitive damages.

## <u>COUNT III</u>
## BREACH OF CONTRACT - CIIA
### (Against Mr. Cobb)

145. PurpleLab incorporates by reference each preceding paragraph of this Verified Complaint as if fully restated herein.

146. On March 24, 2023, Mr. Cobb entered the binding and enforceable CIIA with PurpleLab.

147. Under the CIIA, Mr. Cobb agreed not to make any copies of the Confidential Information without prior authorization from PurpleLab. Ex. B at § 4(a).

148. In violation of the CIIA, on November 21, 2025, Mr. Cobb exported PurpleLab's Confidential Information relating to over 2,000 deals or potential deals without prior authorization.

149. Upon information and belief, Mr. Cobb then kept the Confidential Information by downloading it onto one of his personal USB data storage devices.

150. The CIIA also prohibits the disclosure of PurpleLab's Confidential Information and the solicitation of PurpleLab's clients and employees using the Confidential Information. *Id*. at § 8.

151. As discussed above, Mr. Cobb agreed, *inter alia,* that he would:

    a.    Not "… disclose to any person, firm, corporation or other entity without written authorization of the Company any Confidential Information without written authorization" during or after his employment with PurpleLab;

    b.    [D]uring the term of [his] Relationship with the Company, and for a period of twenty-four months immediately following termination… not use any Confidential Information of the Company to attempt to negatively influence any of the Company's clients or customers from purchasing Company products or services or to solicit or influence or attempt to influence any client, customer or other person either directly or indirectly, to direct his, her or its purchase of products and/or services to any person, firm,

corporation, or other entity in competition with the business of the Company."

c.    "at the time of termination of my Relationship with the Company, [Mr. Cobb] will deliver to the Company (and will not keep in [his] possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, … materials, flow charts, equipment, other documents or property, or reproductions of any of the aforementioned items developed by [him] pursuant to the Relationship or otherwise belonging to the Company, its successors or assigns.

*Id*. at §§ 4(a), 6, 8.

152.    These restrictions are necessary to safeguard the Confidential Information from competitors.

153.    PurpleLab has a real and legitimate interest in protecting its Confidential Information and maintaining its customer relationships, *particularly* against competitors such as Komodo.

154.    PurpleLab fulfilled all its contractual obligations pursuant to the CIIA.

155.    Mr. Cobb has and continues to violate the CIIA by providing Komodo with the Confidential Information that he misappropriated from PurpleLab.

156.    Mr. Cobb continues to violate the CIIA by soliciting or assisting Komodo in soliciting PurpleLab's current or prospective clients using the Confidential Information.

157.    Mr. Cobb agreed that a "violation of this Agreement by me may cause the Company irreparable harm and therefore agree that the Company will be entitled to seek extraordinary relief in court, including without limitation, temporary restraining orders, preliminary injunctions and permanent injunctions without the necessity of posting a bond or other security and in addition to and without prejudice to any other rights or remedies that the Company may have for a breach of this Agreement." *See id*. at § 10(f).

158.     As a direct and proximate result of Mr. Cobb's breaches, PurpleLab has been damaged in the form of lost profits, lost business opportunities, and other consequential and incidental damages in an amount to be proven at trial.

159.     In addition to monetary damage, PurpleLab also suffered and continues to suffer irreparable harm, including harm to its competitive position and reputation with prospective clients, for which there is no adequate remedy at law absent equitable relief.

**COUNT IV**
**BREACH OF CONTRACT – Separation Agreement**
**(Against Mr. Cobb)**

160.     PurpleLab incorporates by reference each preceding paragraph of this Verified Complaint as if fully restated herein.

161.     On December 4, 2025, Mr. Cobb entered into the binding and enforceable Separation Agreement with PurpleLab. Ex. C.

162.     PurpleLab fulfilled all its contractual obligations pursuant to the Separation Agreement.

163.     Under the Separation Agreement, Mr. Cobb agreed *inter alia* that he would:

a.   promptly return all property and documents (whether in hard copy or electronic form) of PurpleLab in his custody or possession;

b.   abide by the terms of the CIIA, with the exception of the provision prohibiting him from working for a competitor;

c.   abide by the CIIA and "applicable common law and/or statutory obligations relating to the protection and non-disclosure of PurpleLab's trade secrets and/or confidential and proprietary documents and information, and [Mr. Cobb] specifically agree[s] that [he] will not disclose any confidential or proprietary

22

information that [he] acquired as an employee of PurpleLab to any other person or entity, or use such information in any manner that is detrimental to the interests of PurpleLab".

*Id*. at § 4.

164.    Additionally, Mr. Cobb agreed that a "breach of this Section 4 will constitute a material breach of this Agreement and, in addition to any other legal or equitable remedy available to PurpleLab, will relieve PurpleLab of the obligation to provide any Consideration not already paid or provided and/or entitle PurpleLab to recover any Consideration already paid or provided." *Id*.

165.    Mr. Cobb did not return all property and documents, including the Confidential Information, to PurpleLab.

166.    Mr. Cobb has not abided by the terms of the CIIA and continues to breach the CIIA.

167.    Mr. Cobb has disclosed confidential and proprietary Confidential Information and trade secrets to Komodo and has used such information to the detriment of PurpleLab.

168.    Additionally, the Separation Agreement included an Advisory Agreement where Mr. Cobb agreed, *inter alia,* that "[i]n addition to the obligations under the CIIA, … no copies of Company Confidential Information may be made by Advisor except as may be necessary to perform Services relating to the Confidential Information as requested by Company." *See* Advisory Agreement, attached to Ex. C as Ex. A.

169.    The above-mentioned restrictive covenants are reasonable and necessary to safeguard the Confidential Information from competitors.

170.    In violation of the Advisor Agreement, Mr. Cobb copied Confidential Information and disclosed and used the Confidential Information without authorization.

171.    Mr. Cobb has not returned the Confidential Information or any copies thereof to date.

172.    Mr. Cobb has and continues to violate the Advisory Agreement through his current employment with Komodo, where he is disclosing Confidential Information to the benefit of himself and Komodo.

173.    Mr. Cobb has and continues to violate the CIIA by soliciting or assisting Komodo in soliciting PurpleLab's current or prospective clients using the Confidential Information.

174.    As a direct and proximate result of Mr. Cobb's breaches, PurpleLab has been damaged in the form of lost profits, lost business opportunities, and other consequential and incidental damages in an amount to be proven at trial.

175.    Mr. Cobb's breaches of the Employment Agreement have and continue to cause significant and irreparable harm to PurpleLab.

176.    The actions of Mr. Cobb were and are intentional, willful, outrageous, and malicious, justifying the imposition of not only compensatory damages and injunctive relief but also attorneys' fees and costs, exemplary damages, and punitive damages.

## COUNT V
## TORTIOUS INTERFERENCE WITH CONTRACT
### (against Komodo)

177.    PurpleLab incorporates by reference each preceding paragraph of this Verified Complaint as if fully restated herein.

178.    The CIIA and the Separation Agreement are binding and enforceable agreements between Mr. Cobb and PurpleLab.

179.     The CIIA and the Separation Agreement, among other things, required Mr. Cobb not to disclose or otherwise misuse the Confidential Information.

24

180.    As a larger, experienced competitor, Komodo knew or should have known that Mr. Cobb had a contractual obligation not to misuse the Confidential Information.

181.    Komodo interfered with the contractual relationships between Mr. Cobb and PurpleLab, not only for its own profit, but to intentionally cause harm to its competitor, without justification.

182.    Komodo's interference was improper under the circumstances, given Komodo's motives and the nature of its conduct.

183.    As a direct and proximate result of Defendant's intentional and improper interference, Komodo misappropriated the Confidential Information, damaging PurpleLab in the form of lost profits, lost business opportunities, and other consequential and incidental damages in an amount to be proven at trial.

184.    In addition to monetary damage, PurpleLab is entitled to injunctive relief because it also suffered and continues to suffer irreparable harm, including harm to its competitive position and reputation with prospective clients, for which there is no adequate remedy at law absent equitable relief.

185.    Komodo's actions were and continue to be intentional, willful, outrageous, and malicious, justifying the imposition of injunctive relief and punitive damages.

### COUNT VI
### TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL RELATIONS
### (against Komodo)

186.    PurpleLab incorporates by reference each preceding paragraph of this Verified Complaint as if fully restated herein.

187.    At all relevant times, PurpleLab had a reasonable probability of entering into prospective contractual relations with Client 1 and Client 2 for healthcare data analytics services on terms negotiated and nearly finalized.

188.    The prospective contracts were sufficiently concrete and probable.

189.    PurpleLab reasonably expected to realize economic benefit from the prospective contracts with Client 1 and Client 2.

190.    Komodo was also vying for the business of Client 1 and Client 2.

191.    Komodo knew of PurpleLab's advanced negotiations with Client 1 and Client 2, and of the reasonable likelihood that PurpleLab would successfully enter into such contractual relations.

192.    Knowing that it was probable that PurpleLab would enter into contracts with Client 1 and Client 2, Komodo intentionally and improperly interfered with those relations by engaging in willful and wrongful conduct, including but not limited to improperly using or encouraging the use of, and misappropriating the Confidential Information to undercut PurpleLab's prospective deals.

193.    Komodo interfered with the prospective contractual relationships not only for its own profit, but to intentionally cause harm to its competitor, without justification.

194.    Komodo's interference was improper under the circumstances, given Komodo's motives and the nature of its conduct.

195.    As a direct and proximate result of Defendant's intentional and improper interference, the prospective contracts were not consummated, damaging PurpleLab in the form of lost profits, lost business opportunities, and other consequential and incidental damages in an amount to be proven at trial.

196.    In addition to monetary damage, PurpleLab is entitled to injunctive relief because it also suffered and continues to suffer irreparable harm, including harm to its competitive position and reputation with prospective clients, for which there is no adequate remedy at law absent equitable relief.

197.    Komodo's actions were and continue to be intentional, willful, outrageous, and malicious, justifying the imposition of injunctive relief and actual and exemplary damages, including attorneys' fees and costs, and punitive damages.

**COUNT VII**
**UNFAIR COMPETITION**
**(against Komodo)**

198.    PurpleLab incorporates by reference each preceding paragraph of this Verified Complaint as if fully restated herein.

199.     Komodo and PurpleLab directly compete for the business of the same customers, such as Client 1 and Client 2.

200.    At all relevant times, PurpleLab owned and lawfully possessed the Confidential Information and has not authorized Mr. Cobb or Komodo to disclose or use them outside of Mr. Cobb's employment obligations to PurpleLab.

201.    Komodo's misuse and misappropriation of the Confidential Information, or encouragement of the misappropriation of the Confidential Information, constitutes unfair, deceptive, unethical, and unscrupulous commercial conduct.

202.    Defendant's conduct was willful, malicious, and undertaken with the intent to misappropriate PurpleLab's competitive advantages and to divert business and contractual opportunities from PurpleLab.

203.    As a direct and proximate result of Komodo's unfair competition conduct, PurpleLab has suffered damages in the form of lost profits, lost business opportunities, and other consequential and incidental damages in an amount to be proven at trial.

204.    As a direct and proximate result of Komodo's unfair competition conduct, PurpleLab has suffered irreparable damages in the form of, including but not limited to, harm to its competitive position and reputation with prospective clients, for which there is no adequate remedy at law absent equitable relief.

205.    PurpleLab is entitled to injunctive relief restraining Komodo from further use or disclosure of Confidential Information and from soliciting business derived from such misuse, and requiring the return and/or destruction of Confidential Information in Komodo's possession, custody, or control.

206.    Komodo's actions were and continue to be intentional, willful, outrageous, and malicious, justifying the imposition of injunctive relief and actual and exemplary damages, including attorneys' fees and costs, and punitive damages.

### COUNT VIII
### CONVERSION
### (against Mr. Cobb and Komodo)

207.    PurpleLab incorporates by reference each preceding paragraph of this Verified Complaint as if fully restated herein.

208.    At all relevant times, PurpleLab owned and lawfully possessed the Confidential Information and has not authorized Mr. Cobb or Komodo to disclose or use them, outside of Mr. Cobb's employment obligations to PurpleLab.

209.    Both Komodo and Mr. Cobb intentionally and unlawfully exercised dominion and control over the Confidential Information.

210.    As a direct and proximate result of Mr. Cobb and Komodo's conversion, PurpleLab has suffered damages in the form of lost profits, lost business opportunities, and other consequential and incidental damages in an amount to be proven at trial.

211.    As a direct and proximate result of Mr. Cobb and Komodo's conversion, PurpleLab has suffered irreparable damages, including in the form of harm to its competitive position and reputation with prospective clients, for which there is no adequate remedy at law absent equitable relief.

212.    Mr. Cobb and Komodo's actions were and continue to be intentional, willful, outrageous, and malicious, justifying the imposition of injunctive relief and actual and exemplary damages, including attorneys' fees and costs, and punitive damages.

## COUNT IX
### BREACH OF FIDUCIARY DUTY OF LOYALTY
### (against Mr. Cobb)

213.    PurpleLab incorporates by reference each preceding paragraph of this Verified Complaint as if fully restated herein.

214.    As PurpleLab's CMO, Mr. Cobb was in a position of trust and confidence and owed PurpleLab a fiduciary duty to act in the best interests of PurpleLab.

215.    Mr. Cobb breached his fiduciary duty by, *inter alia*, intentionally exporting and downloading Confidential Information on over 2,000 deals, with the intent to misuse and misappropriate the Confidential Information at Komodo and to the detriment of PurpleLab.

216.    As a direct and proximate result of Mr. Cobb's breaches of fiduciary duty, PurpleLab has suffered damages in the form of lost profits, lost business opportunities, and other consequential and incidental damages in an amount to be proven at trial.

217.    Mr. Cobb's actions were intentional, willful, outrageous, and malicious, justifying the imposition of injunctive relief and actual and exemplary damages, including attorneys' fees and costs, and punitive damages.

**WHEREFORE**, Plaintiff PurpleLab respectfully requests that this Court issue the following relief:

1. Enter an order enjoining Mr. Cobb and Komodo from:

    a. Using, possessing, or accessing any of PurpleLab's Confidential Information; and

    b. Disclosing or transferring any of PurpleLab's Confidential Information to anyone not authorized to receive such information.

2. Enter an order enjoining Komodo from unfairly competing with PurpleLab;

3. Enter an order requiring Mr. Cobb and Komodo to return any and all Confidential Information that they possess or is within their custody or control to PurpleLab;

4. Enter judgment against Mr. Cobb and Komodo in favor of PurpleLab for compensatory damages in an amount to be determined at trial;

5. Enter judgment against Mr. Cobb and Komodo for punitive damages for their willful and malicious conduct in an amount to be determined at trial;

6. Award PurpleLab its reasonable attorney fees, costs, and expenses incurred as a result under the Pennsylvania Uniform Trade Secrets Act, and the Defend Trade Secrets Act; and

7. Award PurpleLab any such other relief as this Court deems just and proper under the circumstances.

Respectfully submitted,

KANG HAGGERTY LLC

By: */s/ Kyle Garabedian*
    Edward T. Kang
    Kyle Garabedian
    Walter Bourdaghs
    123 S. Broad St., Suite 1950
    Philadelphia, PA 19109
    P: (215) 525-5850
    F: (215) 525-5860
    ekang@kanghaggerty.com
    kgarabediun@kanghaggerty.com
    wbourdaghs@kanghaggerty.com
    *Counsel for Plaintiff*

Dated: February 4, 2026

Docusign Envelope ID: 9A19CEDF-BA88-4E53-A709-29EF4D90FDA3

## VERIFICATION

I, Mark Brosso, hereby certify that I am the CEO of Plaintiff named herein, and that I am authorized to make this verification on behalf of PurpleLab, Inc. I verify that the facts set forth in the foregoing are true and correct to the best of my knowledge, information, and belief. I understand that this verification is made subject to the penalties of 18 Pa.C.S.A. §4909 relating to unsworn falsification to authorities.

Dated:   February 3, 2026 | 1:42/sPM PST    *Mark Brosso*